Welcome, Council. Please make your appearance for the record and proceed. Good morning, and may it please the Court. I'm Aaron Colangelo for the Appellants. I'd like to reserve three minutes for rebuttal. The County and the District have been held liable for nearly 500 violations of their stormwater permit. Injunctive relief for those permit violations is not moot because the County and District failed to show that it is highly unlikely that their permit violations will recur. As an initial matter, this Court has jurisdiction to hear this appeal because the District Court expressly refused an injunction. Under Section 1292A1, orders expressly refusing an injunction are directly appealable as of right. With respect to mootness, the defendants failed to meet their formidable burden of demonstrating that future violations are highly unlikely. Let's assume for a moment, Council, that you're right about our having jurisdiction based on the injunction, the finality of that, and arguably that the case is not moot. According to the papers, as I understand them, the County and NRDC have signed a settlement agreement which has now been distributed to the EPA and DOJ. Is that correct? That's correct, Your Honor. If I understand correctly, they have until November 17th to either disapprove of it, or if they don't do anything, I gather it's deemed approved. Is that correct? That's partially correct, Your Honor. First, on the date they wrote us yesterday and said they believe they have until November 18th, a day later than we advised this Court. But also, this is a notice period only. The EPA and the Justice Department can't disapprove or approve the consent decree or the proposed consent decree. At the conclusion of the 45-day period, they'll submit a letter to the District Court and the parties stating their position on it. And after that, at the end of that period, we'll submit the proposed consent judgment to the District Court, asking the Court to enter the judgment and then dismiss the case with prejudice. Okay, so nothing turns into a pumpkin on November 18th or 17th, right? That's correct, Your Honor. Okay, and so let's assume it's all arguendo. I don't want the folks over here to worry. Assume arguendo that we have jurisdiction on the relief issue, that it's not moot. And let's assume for a moment that we're in limbo temporarily with the EPA and the DOJ. What specifically does NRDC ask that this Court do before that happens or later? Well, Your Honor, it's hard to see that it's worth the Court's resources at this time to decide this appeal given that we've signed an agreement with the defendants. It is pending in front of the federal agencies right now for this notice period, and then it will go to the District Court. But it is highly likely that, at least in our view, that the District Court will enter the judgment. And so in about six weeks, we'll be moving to dismiss the case with prejudice, assuming that she does enter the proposed consent judgment. Well, let's just assume, again, arguendo. Let's assume for a minute that the EPA and the DOJ timely approve the settlement agreement. And Judge O'Connell enters the dismissal with prejudice. But let's further assume that your backsliding suit is successful. Then what happens? That would not undo this settlement. Those are entirely independent. Well, who's going to watch over this? Over this consent judgment? Yeah. We will be asking the district judge to retain continuing jurisdiction to enforce the terms of the decree. Who's going to be on it every day to see that this thing gets done? This case has been almost 10 years old. That's correct, Your Honor. That's a long time. It is. We will be, Your Honor. And this case, what do you estimate it's going to cost to complete all this? That I can't answer, Your Honor. $20 billion? $30 billion? It's going to cost a lot of money. I think that's high. It will cost a lot of money. I don't think that's high. For the defendants to come into full compliance with their stormwater permit obligations, they've projected that will take them a long time and will cost them a lot of money. That's correct. How much have they projected? I don't know the exact number, Your Honor. I'm not asking for the exact number. I think it's around, say, $2 billion, $1 or $2 billion. $1 or $2 billion? That's extrapolating from numbers in some of their watershed programs, Your Honor. As far as who's going to monitor this proposed consent judgment, we will. in making sure that the defendants do everything that they're committing to do in this consent decree. There's a dispute resolution provision so that if they fail to comply, we can get in touch with them right away with any provision. And if the informal dispute resolution doesn't work, we'll go back to district court. And this is just one piece of their overall stormwater obligations. They will still be bound by their stormwater permit going forward. And so if there are future violations, they could be subject to state or federal enforcement or a citizen. How many enforcement officers does the state have? That I don't know, Your Honor. How many enforcement officers does the federal government have? I don't know. So how can you answer that question if you don't know? Well, we will be following very closely their future compliance. We've litigated this case for nearly 10 years. And where are we? Well, we're close, we hope, to a final consent judgment. Why did it take 10 years? There was a lot of back and forth, up and down in the various courts. We had a heavily contested question about liability that took a while.  So I guess I'm struggling with what my colleague is here. It seems like the safe harbor provisions, I'll call them, in effect allows the county without obligation to say magic words. We're moving forward, but not doing anything and just indefinitely postponing this. Is that incorrect? In our view, that is correct, Your Honor. We are challenging the safe harbor provisions of the permit because we think they allow the county and the district and the other dischargers in the future to avoid meeting pollution limits based on their written plans, which they may or may not implement. They may or may not follow through. Basically, it's an illusory deal. So what are you enforcing? If it's voluntary on their part and they would have to raise probably bond funding, a lot of money to implement this, and if they don't do it, what are you enforcing? Well, let me separate our proposed consent judgment with any future violations. What we're looking for now through the consent judgment we've entered with the defendants is what we believe is an appropriate remedy for their 500 adjudicated violations. Those go back to 2003, and we've worked out a settlement that we think will resolve that. So in other words, to be sure I understand, we found liability on the part of the county. You're saying that in your negotiations with the county, and I gather when I say the county, I guess there are 84 jurisdictions altogether, if I understand, so I'm using shorthand. You negotiated with the county a way to, if you will, implement the liability portion of what's already been adjudicated under the old permit. Is that correct? That's correct, although the relevant provision was carried forward in the new permit. And when we went back to district court, we asked the district court to enumerate their violations, and she determined based on their monitoring reports that they had 500 violations over the past decade. So we have a settlement that would resolve those. When you say resolve, what do you mean? You have a settlement that says, okay, we, the county, agree we've committed X violations, and this is what we're going to do in an enforceable way to take care of the violations. Is that right? The latter part of that. I don't think they admit to the enumeration. It's like an SEC decree. You do anything you want, you don't admit it, but you have to pay this money. And they'll commit to implementing pollution control that will mitigate the adjudicated violations. That does not mean that we will turn a blind eye to any future violations. And if the state and federal agencies don't step in to enforce, we will. And so any concern, and that includes challenging the permit itself, which we are currently doing. That's the 2012 permit. That's the 2012 permit. And not the entire thing, Your Honor, but certain provisions, the safe harbor provisions, that create this shield for violating pollution limits if they develop plans. Then why isn't it important to you to have an ability to get an injunction to enforce that portion of this? I don't know about the settlement agreements. I haven't seen it. To enforce that, why wouldn't you need injunctive power on that? Well, our proposed consent judgment would give us the equivalent of injunctive power to enforce that. Okay. It would obligate them to do certain things. We would be asking the district court to retain jurisdiction to enforce those. And if they didn't, we could move to enforce the consent decree. So there is an injunctive provision in our consent judgment. So that, but that's a new, basically it's a new injunction. You're saying that the existing injunction is no longer necessary from your perspective. Well, there is no existing injunction, Your Honor. I misspoke. You sought injunctive relief. Correct. The district court said that finally you're not going to get one, gave a final ruling at least by arguendo. Correct. And I'm just saying, is it NRDC's position that that injunction that you sought is no longer necessary? Yes, because the consent judgment would substitute for that. It includes an injunctive provision. Okay. So, again, the previous violations are moved forward. You have a consent decree that allows you to enforce it. It has such an arbitration agreement, right, or mediation or whatever it is that satisfies you, which wouldn't be in court. But if you don't work it out, then you can go to court. Is that right? Correct. Then we could go to court to enforce what they've agreed to do in the consent judgment, and we would reserve our rights to sue over any future violations. That includes challenging the permit itself, challenging the programs submitted under the permit, which are also deficient, and challenging any violations of pollution limits. That would be a new suit? That would be a new suit. That's correct. Okay. You said you wanted to reserve some time. Up to you, but you're at that time now. All right. Thank you very much. Very well. All right. We'll hear from the county, please. May it please the Court, Timothy Coates on behalf of Los Angeles County Flood Control District and the County of Los Angeles. Will you keep your voice up, please? Sorry, Your Honor. Absolutely. The Court wants me to go into the merits of the appeal or wants to cut to the chase on the practical implications? For my part, I'd rather cut to the chase. I don't know whether my colleagues agree or not. I want to know when you're going to get this thing over with and done. Why does it take so long? Well, I think stormwater management, you look at the papers filed in here, you look at the proposals that have been submitted. Well, we look at the papers filed in here. Correct. Yeah, and it's not easy to read them, you know. It is not. You know, when you've got two pages of acronyms, I was going to ask you to put together a whole paragraph just using acronyms and nothing else. I think they're pretty close in some of the regulations. I will agree with the Court on that. And they're written by lawyers. Not by good lawyers. One of the points I want to make is, and I think it's under the new permit, and we're talking about safe harbor provisions and commitment to them, is that the county is in compliance with those and has taken major steps. And it's not just a declaration of we're going to do this. Bear in mind that these are, a lot of them are large public works projects, and there's been a confluence of two things here. One, the desire, of course, to control pollution from stormwater runoff. The other is, with the drought, ways to reclaim water and recharge aquifers. And this confluence, I think, has led to a general political desire to overall better water management. And that is what I think the WIMPs, as they call them, the Water Management Programs, and the eWIMPs, Enhanced Water Management Programs, they're designed to do. And so the county ends up committing budgeting. I mean, the planning for these things. You're already, I think the county's budgeted $50 million or something for next year for the planning of these projects and to start breaking ground on them. So it is an ongoing commitment. Let me ask you this, counsel. You, of course, are familiar with subsection O about the safe harbor, I mean, the backsliding provisions. Yes, yes. My question is, if you read O, it seems very clear that, although we haven't seen the actual settlement agreement, it seems like there is backsliding. So the question is, what subsection of the exemptions do you believe that the county fits into that takes you out from under O in some way? With respect to the new permit. The new one, I'm sorry. The new permit. Yeah. It's the portions, I think it's Roman numeral 5C, it's ER 245, 246. I'm sorry, say that again, please. I believe it's 245 and 246 of the 2ER, which I believe is the permit provisions. Oh, so you're referring to provisions of the permit, right? Of the new permit. And it says, compliance with the water management program, enhanced water management constitutes compliance with the receiving water limitations. Forgive me, I probably wasn't clear. What I'm talking about is when you look at the actual act, the Clean Water Act. Correct. And you talk about the permit provisions. Right. Subsection O talks about backsliding, which in lay terms says you can't ever agree to be less efficient, more polluting in a future deal or a changed deal than you do in the past. Correct. Then there are some subsections from there that exempt out certain types of actions. So my question to you is, upon what subsection is the county relying upon to get out from under O? Well, I think their point, and this is being litigated in state court now. Yeah, I get that. I get that. And so we'll see what the state court says, but both the regional board and the state board have rejected that construction. Because I think what they view it as, it's not backsliding because you're moving towards complying with those standards. I think it's an understanding that you cannot halt stormwater pollution by snapping your fingers. You do it as a process, and I think that's why the regional board went to this water management program. Enhanced water management is you're going to get to those standards. We understand you need time to get to those standards. It's not in anyone's interest to have immediate violations. I understand your point, but apparently I'm not being clear here. Subsection O-1 of the anti-backsliding provisions of the Clean Water Act says that in the case of effluent limitations established on the basis of the permit section, a permit may not be renewed, reissued, or modified on the basis of effluent guidelines promulgated under another section of the titles subsequent to the original issuance of such permit to contain effluent limitations, which are less stringent than the comparable effluent limitations in the previous permit. So that's the backslide. In other words, just on its face, the 2001 permit was more stringent than the 2012 permit. Subsection 2 says exceptions. And my question to you is, which of the exceptions is the county relying upon to get out from under 1? Well, I think it's the notion that it's the effluent limitations are the same, that the limitations remain the same. I think it's the goal of the permit is it's a process to get to those. Okay. So the limitations are the same. You're not saying that you're relying on a particular exemption. You're just saying that the effluent is no greater under the 2012 permit than it would be under the 2001 permit. The receiving water limitations stay the same. What the regional board recognized was you're never going to get there immediately. You'd be an instant violation. This is a process. The permit's designed to channel your behavior, to compel certain behavior. And it does. And it does now by saying, look, if you want to avoid having an instant penalty, you're going to have to show that you're actually making progress to do something about this. And there are reporting periods within the water management programs, within the enhanced water management programs, that say, okay, now every two years, what are you doing? Have you put in this money? Are you doing these projects? Okay, and I get that. Yeah. I get that. But let's just say hypothetically that a court, federal, state, whatever, says, you know, we get that. It's a difficult problem. It's very expensive. And you've got the drought issue. You want to build up the aquifer and rebuild your groundwater and so on. But the reality is you've got all these poisons going into the bay, and I can't find anything in the exemptions that lets you do that. Then where are we? Then ultimately, if a court says that the permit, if it's challenged, and the court says, no, it's backsliding, then the regional board has to go back and modify the permit. But it's currently a lawful permit. It was issued by the regional board, and it was approved by the state board. It's being challenged collaterally in court now. But it is now the applicable permit that the county and the flood control district are operating under, and they are in compliance with. Well, what you're saying is that the permit is the permit. Yes. My question was, does the permit comply with federal water law? And my other question was, if it doesn't, where are we? And I gather you're saying if it doesn't comply with it, then you've got to go back to the drawing board. Correct. All bets are off. You have to go back to the drawing board because it would be remanded to the state board to rewrite the permit. Okay. Lord, is anything further? No, no. Has the county been servicing the storm drain system, cleaning up? Oh, yeah. Yes. Huh? Yes, absolutely. I mean, addressing various aspects of it. There are more trash collection things. There's less trash going into the sewers, less pollution from the trash going in. They're not doing a very good job of it, are they? They're trying. They're trying, yeah. They've committed tens of millions, hundreds of millions of dollars over decades to do this. It is a very difficult problem. What have they done? How much money have they spent? Like I said, I think just budgeted for next year is something like $50 million for the water management program for new facilities, and that's going to be increasing, or maybe it's next year's budget. That's to clean up all the storm drains? That's to start projects to – Well, I'm talking about what they've been doing in the past, maintaining the storm drains so they're clean. You know, you go buy storm drains, you see stuff all plugging them up, and then it overflows, you know, into the streets and causes a lot of problems.  Well, they have storm drain people. That's their job to go around and try and clean it, and they clean it as best they can. Where do they hide out at? Excuse me? Where do they hide? I don't know. But I see them. I've never seen one, and I've lived in L.A. all my life, except for a few years. I'm never – I mean, I'm concerned about that. You can just drive down the street, and you'll see filth in all the storm drains. Once in a while, I think I've seen somebody go in and try to take some things out, but it just sits there, and it all flows into the ocean, doesn't it? Yeah, that's why – Yeah, it all ends up in the bay. That's why one of the enhanced – or one of the water management programs, one of the plans in there is increased monitoring of – Trash basin. The county has known about this for decades and decades, right? I think everyone here has known about stormwater. That's certainly true. Stormwater I'm talking about. Mr. Coates, I wanted to get to another portion. Who's going to watch over you? Who's going to make sure you do what you're supposed to do, the county? Well, like I said, one aspect of the water management program is the collection – you know, trash monitoring for storm drains and the regional board. We're supposed to report back, I think, in two-year increments on how far we're doing on that management program. So they're the ones on us. How many inspectors are there? That I don't know. How much is this all going to cost? The entire water management program going forward under the new permit over – since the TMDLs go into the 2020s area, we're probably talking hundreds of millions of dollars, almost a billion, I think, the projected cost over the lifetime. These are large public works projects designed to address both stormwater pollution and recovery of water for aquifers. Mr. Coates, I wanted to get to another aspect of this. Reading what I have, I don't have the settlement agreement, but in the briefs it suggests that the county's involvement in the WMPs and EWMPs is voluntary. Do you agree with that? Probably not, because the choice is between that and committing a permit violation, which is why I think it's not precisely voluntary, because it's like saying I can comply with the law or I can go to jail. But, I mean, in the permit itself, is there an obligation to do something at a particular time that you have to do? Once you've elected to go by way of a water management project or an enhanced water management, then timelines start in. But if you don't ever get there? If you elect not to do a WMP, then you have a receiving water limitation violation, and it's monitored at your outfall, which is now different. They've changed the compliance monitoring, not in the middle of the river. It's at your individual outfall. Then you could be in violation if you had exceedances of the receiving water limitations. Okay, so I hear you saying that it really isn't voluntary. What's voluntary is the timing. But even the timing has some limits, because if you get down below a certain point, then you have the affluent coming out in contradiction, right? Exactly, which is why when the new permit came out, the county promptly elected to go down the water management program and enhanced water management program route. And if I understand it correctly, there are seven WMPs that have been authorized, submitted to the Regional Water Quality Control Board, and, let's see, 23 EWMPs. Is that correct? Yeah. So on those, if I'm understanding you correctly, the county has said, okay, this is voluntary, but we are going forward. This is what we're doing to address water quality, yes. Okay. Yeah. So at this point, were the county to back out of those, would there be a penalty? Well, if you ceased in the progress report, then you would no longer be in compliance. To comply with the permit, you have to be in compliance with the WMP requirements and the enhanced water management program. So you would be out of compliance at that point, because you are no longer complying with those. Is there a chart that anyone's made that would show the extent of this project, show you what's going to go in, where, and how it's all going to operate? I don't know that there's a chart. I know there are lists of projects. I mean, there are various projects. So that you can look at something. Let's say the New York Times came and was doing a story on this. They would give you some diagram, something you could see, and just visualize and see how this thing is going to be operated, where this is located, where the other of this is located, what's going to happen here, what's going to happen there. Is there anything like that? I don't know of anything like that. I don't know if they have one or don't have one. I know, like I said, there are projects throughout the county area that are designed specifically to comply with the enhanced water management program and the water management program, multiple projects. There's a project that I passed on my way here that is in a flood-controlled area just off the 134, near where the cemeteries are. A big project. I'm not sure whether they're putting in a dam or whether they're going to have a project where they're going to reclaim the water. Do you know anything about that? I do not personally know about that. Mr. Coach, we appreciate your argument. Do either of my colleagues have any other questions for the county before we hear a rebuttal? Just a cleanup item. One is I think we had a motion for judicial notice that was essentially in response to the other sides about when they were challenging the permit before the state board, and then we followed up with a motion saying, okay, now the state board's said that the permit is okay. I think the court may have acted on their request for judicial notice, has not acted on ours, and I think it would make sense to grant them both. Thank you for telling us about that, and we will look into it, and if we agree it to be granted, we will do so promptly. And, of course, with the settlement with time 11-17 or 11-18, depending on what the federal agencies are saying, I agree with Mr. Coangelo that I wouldn't want the court to expend resources with this as an imminent done deal, so to speak, subject to further enforcement in the district court according to a consent decree. We get that. I think, however, would you agree there are some important principles involved here in terms of when an injunction, an action by a district court, is final for purposes of an injunction, and there's an issue of mootness where our case law maybe is somewhat lacking? I think they're interesting legal issues. No question about it. No question about it. I think there's a clear circuit split on the appealability issue. On the other hand, I would hesitate to have the court wade into a circuit split on a case that's going to go away. You can rest assured that every day when we get up, we recite the maxim de minimis non curat lex, right? Would you say? The law doesn't bother with trifles in Latin. Now, where's the money going to come from to do this? It's being appropriated. I mean, it's coming out of flood control budgets, coming out of other budgets. Again, there are a lot of pieces here, not just flood control. It's also providing more water. So believe me, it has a strong political base behind it to solve a lot of problems. Well, thank you very much for your argument, counsel. Appreciate it. Counsel for NRDC, you have some rebuttal time. Thank you, Your Honor. I'd like to address three things. First, just on this very last question, there are important principles at issue in this appeal, and there is no circuit split on either the appellate jurisdiction question or the mootness question. All circuits are in agreement, and the Supreme Court has said that as long as there is any reasonable chance that future violations could recur, injunctive relief is not moot, and it's no small thing to strip the court and the plaintiffs of the opportunity even to argue for an injunction once violations have been issued. So I gather NRDC would at least take the position that, putting aside for the moment that you have a new mechanism to enforce and deal with the permit, the 2012 permit, that the finality of the district court's injunction ruling and the mootness issue are important issues that sound in this area of the law from which there would be some benefit in getting clarity. We do agree those are important issues, and there would be a benefit in getting clarity. As Mr. Coates said, we do have a settlement agreement that may be entered by the district court in the near future, but we do agree. When are we going to get a copy of that? After the district court enters, if she grants our request and approves the consent judgment, she'll need to determine that it is in the public interest. Then within five days, we will submit a notice to dismiss this appeal. And you will include a copy of the settlement agreement at that point? We can do that. If you will, please. And I guess I have this question. Since we've been dealing with this for such a long period of time, is there any particular reason why the parties didn't submit to us, even if it were under seal, a copy of this proposed agreement? Because we're just kind of whistling Dixie through the forest. We don't know exactly what it says. We just have representations from the parties about, I guess, what Justice Douglas would call penumbra. We don't know what's in the penumbra. So maybe next time you could keep that in mind. Thank you, Your Honor. I'd be happy to submit it under seal. I can talk to the defendants' counsel about that. I don't know we need it anymore now that we've done this, but please in the future. Why does it have to be submitted under seal? We've agreed with the defendants to keep the terms confidential until it's been entered by the district court as settlement privilege because it has not yet been entered by the district judge. It's not yet officially a final settlement agreement. So we've agreed to keep it confidential, but I would be comfortable submitting it under seal. So now this matter goes to the Justice Department and to the EPA in Washington. Correct. And so there are time limits, 45 days. Is that going to be taken care of within 45 days? Oh, it certainly will. At least they've represented to us that it will be. That's on the Justice Department and EPA. But in the notice, I'm sorry, in the federal regulation, if they do nothing within 45 days, then we can ask the district judge to enter the agreement. Deemed approved, in effect. Deemed approved. Let me address just the other two points I wanted to raise. One was anti-backsliding. And, Your Honor, the permit amendment does not fall into any of the exceptions in 1342-0 for backsliding. This is a relaxation of a critical permit term. The prior permit said no discharges that violate pollution limits. The new permit says that's fine as long as you do a voluntary plan. That might get you there in decades. Now, as far as the remedy for that in state court, it's not the case that all bets are off. It would have to go back to the regional board to start over. We're asking for just a surgical change to the permit. It would be a very narrow amendment to the permit itself. It could be remedied easily. They could continue with their watershed programs. They would just lose the shield from violating the permit that the watershed programs currently give them. And that disagreement, if you couldn't reach agreement, you would go to arbitration, right, first? Oh, no. I'm sorry, on the consent judgment, Your Honor? Yes. No, there's no requirement to go to arbitration. We would work together voluntarily. And then if we – I'm sorry, work together informally. Okay. And if we can't reach agreement, we would go to the district judge. Okay. But I was responding to Your Honor's question about backsliding and what happens to the permit itself. Right. The regional board wouldn't have to start over from scratch. We're just asking the state court to strike the – So, basically, from your perspective, if a court finds – either a federal or a state court finds that the Clean Water Act has been violated because of backsliding, there is no exemption, you're saying that the permit doesn't just disappear. Correct. Rather, there would be an amendment which would fit into one of the exemptions. Is that right? No. I don't think they could – the regional board could devise an amendment that would satisfy the anti-backsliding requirement. Well, then how do you satisfy the Clean Water Act? I mean, as great as you folks all are, there is a federal piece of legislation here. You have to comply with it. Correct, Your Honor. The solution is they would have to take out the violating provision of the permit, but only that provision. In the sense that the portion of the permit that would require – would permit them to do more of an effluent than they did before, is that – Yes. Okay. That's correct, Your Honor. Okay. And Your Honor also asked a question about whether there would be an immediate fine if they fell out of compliance. No, there's no immediate fine. It would require some enforcement by either the state or the federal government or by us. On just the very last point, whether the watershed programs are voluntary, the permit says – this is at ER 40 – that participation in the watershed programs is voluntary. The county's brief on appeal says at page 9 that their participation in these programs is voluntary. So they could decide at any point to walk away. Now, that's interesting because if I understood Opposing Counsel correctly, he said that because the county has committed to – I forget the numbers – some WMPs and some EWMPs, that having so committed, they're in. They can't get out. Do you disagree with that? I do disagree with that, Your Honor. There is nothing binding them to follow through with those watershed programs, and that's one of the main reasons why injunctive relief is not moot. This entire process is voluntary. They have the right to walk away at any time. They may prefer not to. There may be political pressure or something one way or the other. But the entire watershed program mechanism is voluntary. And in the documents themselves attached to the county's judicial notice request, they say we have not dedicated the funding yet to pay for these. But did those both go to the mootness issue? They do, Your Honor. They did. Okay. Any other questions that my colleagues have? No. We thank all counsel. We realize this has gone on for a long, long, long time. But as Judge Fragerson pointed out, there are millions of people who live in this part of the world who depend on their government to keep the water clean because it has a lot of impacts on people for diseases and all kinds of other problems. So we thank you for working together. We hope that this will all move forward in good faith. We are very anxious to see the settlement agreement. We'll count on both or one of you sending us a copy of the approved agreement. And as much as we'd like to see you, we hope we don't have to see you again, that you will move forward on this. And, again, we apologize for the delay, but we celebrate this great man's 93rd birthday. There are very few people who have rendered the great service to the United States in many capacities that Judge Fragerson has, both as a district judge and as a Circuit Court of Appeal judge. And I think you all know he served with great honor in World War II, sustained some very, very serious injuries. And so we salute him. We salute Judge Holland as well. But he hasn't been around as long as he has. I only turned up 80 last week. As you know, I've had a lot of experience in this area, not just in this state, not in just this county, but Oregon, other places. And it's very important that we clean up our ocean waters. I remember when I was a youngster swimming near Venice, and you could actually see some of the human waste floating around. He's never been the same since. And it took a lot of blood, sweat, and tears to straighten out that problem. And the fish are back. The whales are back. The halibut are down in the bottom of the ocean. That size is getting bigger. So we've got to clean this up. This is when I first— You know, other cities process wastewater that comes through the storm drains. They clean it up before it goes into the ocean. San Francisco does. Portland does. Portland wasn't doing it, but they're doing it now. And, you know, we've got to protect the planet. I don't have to tell you this. I know about your organization, and I'm happy that you're working on this. Well, on that happy note, we're going to go— I'm not through yet. Oh, you're not done? Oh, my gosh. You were filibustering here for a long time. But that's— So if you want to make me happy and give me a birthday present, which you don't have to, then I'll even toast it with reclaimed water. You ever seen reclaimed water? Yes, Your Honor. It's purer than this water can get. It's so pure, if you put it in a clean glass, you can't even see the water. It's tasteless. So we add a little something else to it. It tastes better. Anyway, here's my toast to you with reclaimed water. Thank you, Your Honor. Yeah, let's get this done, huh? Absolutely, Your Honor. And you've got to stay on top of it. If you don't, nothing's going to happen. You know that. I do, Your Honor, we will. I know you do. All right, so stay with it. Get the job done. Very well. Thank you. Thank you very much. Thank you, everyone. The case just argued is submitted and the court is adjourned.
judges: Pregerson, M. Smith, Holland